IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG DIVISION

**DONALD J. GOLES,**

       **Plaintiff,**

**v.**                           **Civil Action No.: 3:12-CV-136**
                                        **JUDGE GROH**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT [14], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
[17], AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.  INTRODUCTION

On November 19, 2012, Plaintiff Donald J. Goles ("Plaintiff" or "Claimant"), by counsel

Barry P. Beck, Esq., filed a Complaint in this Court to obtain judicial review of the final decision

of Defendant Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to

Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No.

1.) On January 22, 2013, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United

States Attorney, filed an answer and the administrative record of the proceedings. (Answer, ECF No.

7; Administrative Record, ECF No.8.)  On March 21, 2013, and, Plaintiff and the Commissioner

filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF

No. 14; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 17.)  Following review of the motions

by the parties and the administrative record, the undersigned Magistrate Judge now issues this

Report and Recommendation to the District Judge.

## II.   BACKGROUND

### A.   *Procedural History*

On February 10, 2009, Claimant protectively filed his first application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on March 1, 2005.  (Tr. 285).  This claim was initially denied on August 20, 2009 and was denied again upon reconsideration on January 15, 2010.  (Tr. 170, 171).  On February 5, 2010, Claimant filed a written request for a hearing (Tr. 166-168), which was held before United States Administrative Law Judge ("ALJ") Melvin G. Olmscheid on March 29, 2011 by video: Claimant appeared in Hagerstown, Maryland and the ALJ appeared from Baltimore, Maryland.  (Tr. 88).  Claimant, represented by counsel Barry P. Beck, Esq., appeared and testified, as did David Asher Burnhill, an impartial vocational expert.  (Tr. 115).  On April 28, 2011, the ALJ issued an unfavorable decision to Claimant, finding that he was not disabled within the meaning of the Social Security Act.  (Tr. 85).  On September 28, 2012, the Appeals Council denied Claimant's request for review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1).  Claimant filed this action, which proceeded as set forth above, having exhausted his administrative remedies.

### B.   *Personal History*

Claimant was born on August 14, 1959, and was forty-nine years old at the time he filed his first SSI claim. (Tr. 106).  Claimant earned his GED (Tr. 145) and he has prior work experience in construction work, food service work at Burger King, helping with housework and as a rural route mail carrier.  (Tr. 119-123).  Claimant smoked for 33 years before quitting in 2008.  (Tr. 382).

*C.*     *Medical History*

1.      **Medical History Pre-Dating Alleged Onset Date of March 1, 2005**

Claimant's back pain stems from an accident in 1989, where he was struck by a concrete truck.  (Tr. 460).  Claimant was treated on an outpatient basis in the mid 1990's for cocaine abuse.  (Tr. 541).  Claimant was diagnosed with fibromyalgia by his family doctor in 1995.  (Tr. 460).  Claimant was diagnosed with generalized anxiety disorder and depression in 2003.  (Tr. 468).

2.      **Medical History Post-Dating Alleged Onset Date of March 1, 2005**

Claimant was hospitalized in late 2005 after presenting in the emergency room for diarrhea and was diagnosed with colitis after a colonoscopy.  (Tr. 664).

Claimant visited the emergency room of Franklin Square Hospital on March 25, 2006 for significant arthritis and abdominal pain.  (Tr. 709, 723).  A CT Scan was taken, compared with results from the 2005 visit, and the impression was pancreatitis.  (Tr. 801).

Claimant was hospitalized twice in 2007 for pancreatitis.  First, on June 26, 2007, Claimant was seen at the War Memorial Hospital Emergency Room, following a fall from a twelve-foot scaffolding three days prior to that.  (Tr. 521).  He reported pain in his abdomen and chest, with increased pain when taking deep breaths.  (Tr. 521, 531).  A CT scan was performed and the impression stated that a diffuse edema was seen, most likely representing pancreatitis. (Tr. 523).  An X-Ray revealed no broken bones.  (Tr. 525).  Second, on November 15, 2007, Claimant presented at the War Memorial Hospital Emergency Room, complaining of severe pain in his abdomen and chest lasting two days.  (Tr. 504, 506).  A CT scan was performed, revealing mild pancreatitis.  (Tr. 508).  Significant interval improvement from June 26, 2007 was noted.

(Tr. 508).

On July 30, 2007, Claimant visited Dr. Tressie Duffy as a new person to the area from Baltimore, MD.  (Tr. 829).  He reported having seen doctors there for chronic pain and reported experiencing depression after quitting cocaine.  (Tr. 829).

On January 31, 2008, Claimant was seen by Dr. Duffy for sleeping problems, hesitation with urination and headaches.  (Tr. 827).  He arrived with a cane due to a recent fall on ice.  (Tr. 827).  He was treated for depression and chronic pain.  (Tr. 827).

On November 5, 2008, Claimant visited Dr. Duffy at WV Weight and Wellness, stating he had popped his hip out while lifting a disabled person out of a wheelchair about three weeks prior.  (Tr. 363).  On November 26, 2008, Claimant returned for follow up and lab work and the report stated "overall the patient has been doing well".  (Tr. 367).

On February 4, 2009, Claimant was examined by Dr. Duffy.  (Tr. 432).  He was assessed for low back pain and ordered to undergo physical therapy.  (Tr. 433).  He returned to Dr. Duffy for follow up on February 12, 2009 and presented with low back pain and bilateral leg pain that was aching, did not radiate and was a "6" out of a scale of "1" to "10".  (Tr. 370).  On May 13, 2009, Claimant returned again to Dr. Duffy for follow up, reporting increased pain in the mid-back at the point of impact as well as increasing pain into his legs.  (Tr. 373).  He reported having pain radiating down his legs that was worse in the right leg and abdominal pain.  (Tr. 373).  Dr. Duffy prescribed new medications and instructed him to call or return if symptoms persisted or worsened.  (Tr. 376).

On July 16, 2009, Claimant underwent a spine examination.  (Tr. 378).  His lumbar spine had normal alignment and decreased disc space height at L5-S1 with a posteriorly projecting

osteophytes. (Tr. 378). There was also a finding of mild decrease in the disc space height with anterior osteophytes at L2-L3 and L3-L4. The examination revealed normal alignment with degenerative disc changes in those two areas. (Tr. 378). Claimant did not require the use of a cane at this visit and appeared stable at station and comfortable in the sitting position, but uncomfortable in the supine position as well as lying down and arising form the exam table. (Tr. 383). An examination of Claimant's hands revealed tenderness and swelling. (Tr. 384). There was an observed thickening of the joints in his hand. (Tr. 384). Claimant could not make a closed fist with both hands due to decreased flexion of all the finger joints. (Tr. 384). However, Claimant was able to write with his dominant right hand and pick up a coin with his right hand, although he had difficulty picking up a coin with his left. (Tr. 384).

On August 18, 2009, Claimant was examined by Dr. Duffy for low back pain. (Tr. 400). Claimant reported pain that was shooting and radiating into his legs as well as "strong suicidal thoughts". (Tr. 400). The pain was described as the same as before (Tr. 400) and Dr. Duffy's instructions said Claimant was "to return as needed; patient doing well". (Tr. 403). In addition, she ordered medications, diagnostic studies, and information was given in the form of handouts and recommended trustworthy websites. (Tr. 403-404).

On November 11, 2009, Claimant followed up with Dr. Duffy and presented with generalized body pain and increased pain in his hands, knees, back and ankles. (Tr. 405). Claimant reported his pain as worse than his previous visit. (Tr. 405). Dr. Duffy adjusted Claimant's medications and discussed the benefits of chiropractic care. (Tr. 408). Additionally, it was decided at this appointment to proceed with chiropractic care. (Tr. 408).

On January 10, 2010, Claimant's mental health was assessed. (Tr. 409). Depressive

disorder was found to be present. (Tr. 412). The limitations related to depression appeared "at most to be mild". (Tr. 421). Claimant's case was considered non-severe. (Tr. 421).

On March 26, 2010, Claimant was seen by Dr. Duffy for a follow up visit for generalized body pain. (Tr. 566). He reported pain that was a "10" on a scale of "1" to "10" and swelling. (Tr. 566). He reported being depressed. (Tr. 566). Dr. Duffy described his mood as normal and his affect as appropriate (Tr. 568), but ordered a psychology consultation. (Tr. 569).

On June 15, 2010, Claimant was examined by Dr. Michael Rezaian for psoriatic arthritis in his hands. (Tr. 437). This visit occurred after Dr. Duffy asked Dr. Rezaian to see Claimant in consultation. (Tr. 440). Claimant appeared in pain with apparent distress. (Tr. 445). Dr. Rezaian's examination revealed degenerative change in Claimant's third metacarpophalangeal joint in his right hand and significant degenerative changes in the thrird metacarpal in his left hand. (Tr. 437). Both wrist joints were "normal appearing". (Tr. 438).

On June 25, 2010, Claimant visited Graves Medical Practice for the first time "to establish care" as he stated he had to stop seeing Dr. Duffy because his insurance was no longer accepted there. (Tr. 471). His medical history was taken and a plan was established: no change to his current medications were made but he was given recommendations to keep a headache diary, increase oral fluid intake, try behavioral therapy, alternate cold packs and heat on his lumbar region and thoracic spine area, resume social interaction, increase physical activity and follow up in one month. (Tr. 476-477).

On July 14, 2010, Claimant was seen at the War Memorial Hospital Emergency Room. (Tr. 448). Claimant's chief complaint was of back pain that occurred after washing his car five days prior, stating his pain was an "8" on a scale of "1" to "10" and the pain was exacerbated by

bending and twisting. (Tr. 448). He was given medication and an X-Ray was taken before he was discharged home. (Tr. 451). The X-Ray revealed degenerative changes with diffuse spondylosis. (Tr. 452). The impression was: No acute bony injury and diffuse spondylosis. (Tr. 452).

On July 19, 2010, Claimant was seen for follow up from his ER visit and X-Ray at Graves Medical Practice. (Tr. 466). He reported pain in his lumbar region and thoracic spine, with associated stiffness and paravertebral muscle spasm. (Tr. 466). Claimant's medications were altered, the doctor recommended the use of alternating cold packs and heat and he was ordered to follow up after a consultation with pain management. (Tr. 470).

On July 26, 2010, Claimant was seen for follow up regarding his pain and medication at Graves Medical Practice. (Tr. 460). He complained of pain in the lumbar region and a history of pain in his thoracic spine. (Tr. 460). Claimant characterized his lumbar pain as intermittent, moderate in intensity and as a chronic problem stemming from a 1989 accident where he was struck by a concrete truck. (Tr. 460). Claimant said he experienced stiffness and paravertebral muscle spasms as symptoms to his thoracic spine pain. (Tr. 460). He presented as anxious and he "seem[ed] to be in moderate pain". (Tr. 462). Claimant was given an injection of Solumedrol in the office and was referred to Dr. Rezaian since he is a rheumatologist. (Tr. 464). He was recommended to resume social interaction, alternate cold packs and heat on his lumbar region and thoracic spine and follow up in one month. (Tr. 464).

On August 18, 2010, Claimant was examined at the Rural Outreach Arthritis Center by Dr. Rezaian. (Tr. 490). Dr. Rezaian stated Claimant "is slowly getting better compared to before". (Tr. 490). His joints were less swollen but he experienced generalized stiffness still.

(Tr. 490).  The results of his X-Ray from before were discussed with him.  (Tr. 490).  He was ordered to maintain the current treatment with Humira, a prescription drug for rheumatoid and psoriatic arthritis, as it appeared to Dr. Rezaian to be effective.  (Tr. 490).

On August 31, 2010, Claimant was seen at Graves Medical Practice for a medication revision due to increased pain.  (Tr. 478).  Claimant estimated his pain had increased to a "10" on a scale of "1" and "10".  (Tr. 478).  Claimant also reported joint stiffness in his wrists, shoulders, fingers, neck, lower back, knees and ankles.  (Tr. 478).  Claimant complained of a burning sensation along his left thigh and difficulty sleeping and increased depression.  (Tr. 478).  During his physical examination, he was described as "anxious, seems to be in moderate pain" and his affect was described as flat. (Tr. 481).  He was prescribed new medications and ordered to follow up in one month.  (Tr. 481).

On October 25, 2010, Claimant was seen by Dr. Duffy for a follow up visit from May 12, 2010.  (Tr. 562).  Dr. Duffy stated that "overall the patient has been doing fairly well" and "he is currently on stable dosages of medications".  (Tr. 562).  Claimant stated he was "not doing well with pain".  (Tr. 562).  Dr. Duffy refilled Claimants prescriptions and scheduled labs.  (Tr. 565).

On October 25, 2010, Claimant was seen by Dr. Rezaian.  (Tr. 486).  Dr. Rezaian's impressions were that his arthritis was "improving overall compared to before" and his "current treatment is working with less pain, stiffness and swelling with increase in range of motion throughout".  (Tr. 486).  He was seen at this appointment with "overall less pain, stiffness, and swelling in his joints".  (Tr. 487).  His treatment options were reviewed and weekly treatment with Humira was started.  (Tr. 486).  Dr. Rezaian administered an injection of Humira at this visit.  (Tr. 487).  Claimant was advised to follow up in two months.  (Tr. 489).

From January 13 to January 18, 2011, Claimant was hospitalized at City Memorial Hospital for psychiatric issues following suicidal thoughts and a suicide attempt. (Tr. 534, 537). Claimant stated he could feel "absolutely no benefit" from his pain medications, was described as "very depressed" and "voiced considerable hopelessness that things in his life could ever be much better". (Tr. 534-535). However, "his mood improved significantly as his pain management was optimized". (Tr. 535). He was prescribed a Fentanyl patch for pain. (Tr. 535). He was instructed to follow up with his primary physician, Dr. Duffy, as soon as possible. (Tr. 535). His Global Assessment of Functioning ("GAF") upon discharge was 55. (Tr. 534).

On February 8, 2011, Claimant was seen by Dr. Duffy. (Tr. 559). He presented with low back pain that was a "9" on a scale of "1" to "10". (Tr. 559). Dr. Duffy stated, "[Claimant] has been previously treated with pain medication. The pain medications were effective." (Tr. 559). Dr. Duffy ordered physical therapy and adjusted Claimant's pain medication. (Tr. 561).

On February 9, 2011, Claimant was evaluated by Dr. Christopher Murphy, one of the psychiatrists that treated him during his January 2011 hospitalization. (Tr. 570). Claimant's chronic pain was reported to still be a problem, and Claimant reported some strange mood swings involving both depression and racing thoughts. (Tr. 570). Claimant's medications were altered and he was ordered to follow up in four weeks. (Tr. 570). Claimant reported having a disability hearing coming up on March 19, 2011. (Tr. 570).

On February 11, 2011, Claimant was seen by Dr. Rezaian at the Rural Outreach Arthritis Center. (Tr. 572). Dr. Rezaian reported his rheumatoid arthritis was getting worse with more pain and swelling despite the current treatment. (Tr. 572). Also, Dr. Rezaian noted that overall, Claimant is "definitely worse compared to before with significant worsening of overall

symptomatology". (Tr. 572). He administered Humira to Claimant. (Tr. 572).

On April 18, 2011, Claimant followed up with psychiatrist Dr. Murphy at the West Virginia University Hospitals-East Behavioral Health Center. (Tr. 865). Claimant reported his "sleep has generally been good" and that he had been exercising more. (Tr. 865). He reported still having difficulties with his chronic pain and finding a medication that worked for him, as his Fentanyl patches often did not adhere to his skin. (Tr. 865). He firmly denied suicidal thoughts, and stated that he and his partner have visited their new property several times and were making plans to improve it. (Tr. 865). Dr. Murphy adjusted his medications and made plans to follow up within seven to eight weeks. (Tr. 866).

On April 20, 2011, Claimant was seen in the War Memorial Hospital Emergency Department for abdominal pain lasting four days. (Tr. 850). A CT scan was performed on his abdomen, and the impression was a "normal CT examination of the abdomen. No interval change is noted from November 2007". (Tr. 862). A CT scan was taken of the pelvis and lower abdomen was performed as well, with an impression of a normal CT examination of the pelvis and lower abdomen. (Tr. 862). After being treated in the emergency department, he was ordered to follow up with his primary care provider, which was listed in the emergency room record as Dr. Duffy. (Tr. 852-853).

On May 25, 2011, Claimant was seen by Dr. Duffy for a follow up visit and prescription refill. (Tr. 843). Claimant presented with low back pain, estimating it was an "8 " on a scale of "1 " to "10 ". (Tr. 843). He complained of new pain in his legs and some numbness that had increased within the last two to three weeks. (Tr. 843). Dr. Duffy ordered an MRI of the lumbar spine and prescribed medication. (Tr. 846).

#### D.    *Testimonial Evidence*

Testimony was taken at the hearing held on March 29, 2011.  The following portions of the testimony are relevant to the disposition of the case:

Claimant testified he had past work experience in construction work, in food services at Burger King, in general home upkeep and as a rural route mail carrier.  (Tr. 121-122).  Claimant testified that he used to drink nightly, consuming a half gallon of vodka every week, but that he has quit drinking since his hospitalization in January 2011 and has drank very rarely.  (Tr. 130).

Regarding his daily activities, Claimant testified he completes his rural route mail delivery route five days per week on most weeks.  (Tr. 133).  Claimant testified he does go to the grocery store with his friend and caretaker sometimes, but not very often, to avoid people.  (Tr. 142-143).  He testified he does not attend church or participate in any hobbies that involve other people.  (Tr. 143).  Claimant testified he has his friend cut up his meat because he has problems holding a knife, but after that, he can use a fork well and use his eating utensils.  (Tr. 133-134).  Further, Claimant testified he cannot hold a regular toothbrush, so he uses an electric toothbrush because it's bigger around and he can maneuver it more.  (Tr. 141).

Claimant's attorney asked if his concentration is affected by his depression, and he replied that from his medication he will "forget what [he's] doing".  (Tr. 140).  Claimant testified, when asked, that he forgets to put the mail in someone's box often when completing his mail route.  (Tr. 140).  Claimant testified he has difficulty getting along with others and that he "keep[s] to [him]self all the time".  (Tr. 141).  Claimant testified crowds make him nervous.  (Tr. 141).  Claimant testified he neglects his personal hygiene by not bothering to clean up and not shaving.  (Tr. 141).

Claimant further testified he can walk to the end of his driveway, which he estimated is about 50 to 75 yards before having to stop. (Tr. 141). Claimant testified he can stand and sit as long as twenty minutes at one time. (Tr. 142). He then asked to stand for a few minutes during the hearing. (Tr. 142).

Claimant testified he is able to read books sometimes, depending on the sophistication of the content, but when asked if this was a problem since the beginning of 2011 or has always been an issue for him, Claimant replied it has "pretty much always been an issue". (Tr. 144).

### E. *Vocational Evidence*

The ALJ then solicited testimony from the vocational expert ("VE") David Asher Burnhill. Mr. Burnhill characterized Claimant's past work as follows: a construction worker, also known as day laborer, is very heavy exertional level and unskilled; fast food worker is light exertional level and semiskilled; and rural mail carrier is medium exertional level usually, although Claimant listed it as being performed at the light exertional level and unskilled. (Tr. 146-147, 149-150). The VE testified that Claimant would be unable to do any of his past work but there were significant jobs in the regional or national economy that existed, including cashiering, rental clerk, sorter and parking lot attendant. (Tr. 148-150).

### III. CONTENTIONS OF THE PARTIES

Claimant, in his motion for summary judgment, asserts that the Commissioner's decision "is not supported by substantial evidence." (Pl.'s Mot. at 1.) Specifically, Plaintiff alleges that:

- The ALJ erred by not accepting the treating physicians' opinions;

- The ALJ erred by ruling that Claimant is able to perform light work; and

- The ALJ incorrectly determined that there are jobs that exist in substantial numbers in the

national economy that Claimant can perform.

(Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 1, ECF No. 14-1.) Claimant asks the Court to reverse the decision of the ALJ and "that [Claimant] be awarded disability benefits and supplemental security income." (*Id.* at 9.)

Defendant, in her motion for summary judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1.) Specifically, Defendant alleges that:

•      The ALJ properly evaluated the medical opinions of record and declined to give controlling weight to Claimant's primary care physician and rheumatologist for several legally-sufficient reasons;

•      Substantial evidence supports the ALJ's residual functional capacity ("RFC") assessment, which was based on the record;

•      Substantial evidence supports the ALJ's Step Five finding that Claimant was not disabled.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 10-18.)

## IV.   STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the

case before a jury, then there is "substantial evidence." Laws v. Celebrezze, 368
F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing
court to determine the weight of the evidence, nor is it the court's function to
substitute its judgment . . . if the decision is supported by substantial evidence. See
Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir.
1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial

evidence as "evidence which a reasoning mind would accept as sufficient to support a particular

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance. Laws, 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's

conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability

determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore,

**"the language of § 205(g) . . . requires that the court uphold the decision even should the court**

**disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v.

Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.  DISCUSSION

### A.    *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or
mental impairment or impairments are of such severity that he is not only unable
to do his previous work but cannot, considering his age, education, and work
experience, engage in any other kind of substantial gainful work which exists in
the national economy, regardless of whether such work exists in the immediate
area in which he lives, or whether a specific job vacancy exists for him, or
whether he would be hired if he applied for work . . . .  "[W]ork which exists in
the national economy" means work which exists in significant numbers either in
the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following

five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ."
> 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not

disabled at any of the five steps, the process does not proceed to the next step. Id.

**B.      *Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

> **1.       The claimant meets the insured status requirements of the Social Security Act through June 30, 2009.**

> **2.       The claimant has not engaged in substantial gainful employment since March 1, 2005, the alleged onset date (20 CFR 404.1571 *et. seq.*, and**

416.971 *et. seq.*).

3.  The claimant has the following severe impairments: arthritis, degenerative disc disease, fibromyalgia, asthma, obesity, and depression (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes or scaffolds; only occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; he can only occaisonally reach in all directions (including overhead) bilaterally; can only occasionally perform fingering (fine manipulation) with the left hand; must avoid concentrated exposure to temperature extremes, vibration, fumes, odors, dusts, gases, poor ventilation, etc., and hazards (machinery, heights, etc.); and is mentally limited to unskilled, routine, repetitive work with only occasional interaction with the public and coworkers.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 14, 1959 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.1564).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social

> **Security Act, from March 1, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).**

(Tr. 90-107).

### C.    *Analysis of the Administrative Law Judge's Decision*

####    1.    **ALJ Properly Analyzed & Assessed Claimant's Treatment Records & Treating Source Opinions**

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527(d)(2) (2010). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight." Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). The opinion and credibility of claimant's treating physician is entitled to great weight but may be disregarded if there is persuasive contradictory evidence. Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).

Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2).  See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).  To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).  Subjective evidence of pain alone "cannot take precedence over objective medical evidence or the lack thereof." Gross v. Heckler, 785 F.2d 1163, 1163 (4th Cir. 1986).

Claimant relies on Coffman v. Bowen, 829 F.2d 514 (4th Cir. 1987), to support his assertion that the Fourth Circuit's attending physician's rule mandates treating physicians' opinions may only be disregarded in certain circumstances – if "persuasive contradictory evidence" exists.  See Pl.'s Summ. J. Mot., Pg. 6.  However, Claimant overstates the application of this rule.  Gill v. Astrue, 2012 WL 3600304 (E.D. Va. Apr. 4, 2012) report and recommendation adopted, 2012 WL 3600308 (E.D. Va. Aug. 21, 2012).  Instead, The Fourth Circuit has consistently held that "if a physician's opinion is not supported by clinical evidence or if it inconsistent with other substantial evidence, it should be accorded significantly less weight".  Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

Affording controlling weight to Claimant's treating physicians, Dr. Duffy and Dr. Rezaian, is inappropriate in this case because the ALJ found the opinions to be inconsistent with

other substantial evidence in the record. The ALJ considered Dr. Duffy's opinion, but opted to give it little weight based on several articulated reasons. See ALJ's Decision, Transcript, Pg. 103. These included the proportion of Dr. Duffy's reliance on subjective reports of symptoms and limitations, not reviewing the other medical record, the relatively short length of treatment with Dr. Duffy, the routine and conservative course of treatment provided, the uncertainty of whether Dr. Duffy was familiar with the Social Security definitions when she opined Claimant could "not work" and the fact that Dr. Duffy's opinion contrasts sharply with and is not supported by the other evidence of record. Id.

Likewise, the ALJ considered the opinions of Dr. Rezaian, Claimant's treating rheumatologist, but decided to give his opinion little weight, citing several articulable reasons. See ALJ's Decision, Transcript Pg. 104. These included reliance on subjective reports of symptoms and limitations, the inability of Dr. Rezaian to review the record, the briefness of Claimant's treatment history with this doctor, the routine and conservative mode of treatment, the uncertainty of whether this physician was familiar with the Social Security definitions of disability when stating Claimant could "not work" and the fact that Dr. Rezaian's opinion contrasts sharply and is not supported by the other evidence of record. Id. at 104-105. The ALJ noted that despite Dr. Rezaian's opinions, his own reports fail to reveal the type of significant and laboratory abnormalities one would expect if the Claimant were in fact disabled, citing treatment notes from two separate visits where Dr. Rezaian noted Claimant's improvement and normal results to a checkup on joints, range of motion and swelling. Id. at 105.

The ALJ also pointed to other evidence in the record to support his allocation of weight, including Claimant testifying that he can lift a seventeen pound bag of dog food and carry it 25

feet from his car to his house, Claimant reporting that in October 2008 he lifted a disabled person from a wheelchair, Claimant reporting in May 2009 that he did household chores and took care of dogs and Claimant stating in July 2009 that he could lift 25 pounds.  Id. The ALJ took from the record that regarding daily living activities, Claimant retained the ability to clean, shop, cook, drive, pay bills, maintain a residence, care appropriately for grooming and hygiene, and use telephones and directories on a consistent basis, noting it may take longer on a bad day.  Id. at 94.  At the hearing, the ALJ questioned Claimant on looking forward to attending a Halloween party in 2010, continuing to work and helping around the house.  See ALJ Hearing Transcr., Pg. 124.  He inquired into which parts of "taking care of the house" Claimant could and could not do, as well as which jobs had to be taken care of by the other member of the household.  Id.  In short, the ALJ reviewed multiple sources in the treatment record and discussed items of his assessment of the record with Claimant at the hearing for further detail and clarification.

Additionally, the ALJ articulated that the treating physicians relied "quite heavily" on the subjective report of symptoms and limitations provided by Claimant, seemingly uncritically accepting as true most, if not all, of Claimant's reports.  Id. at 104.  In this case, this caused the ALJ pause because his review of the record found good reasons for questioning Claimant's reliability on subjective complaints.  Id.

The ALJ thoroughly considered the opinions of the treating physicians and articulated his reasons for allocating little weight to the treating source opinions.  He pointed to other evidence in the record.  This Court finds the ALJ was proper in his assessment and weighing of Claimant's treating source opinions.  Accordingly, Claimant's argument is without merit.

### 2. ALJ Properly Assessed Claimant's Residual Functional Capacity ("RFC")

[R]esidual functional capacity is the most [a claimant] can do despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). "It is an administrative assessment made by the Commissioner based on all the relevant evidence in the case record." <u>Felton-Miller v. Astrue</u>, 459 Fed. App'x 226, 230-31 (4th Cir. 2011); <u>see</u> <u>also</u> 20 C.F.R. §§404.1546(c), 416.946(c) (assigning responsibility of RFC assessment at hearing level to ALJ); SSR 96-8p (identifying RFC finding as administrative assessment and outlining criteria to be used). Further, an ALJ is "not required to obtain an expert medical opinion as to [a claimant's] RFC", and can properly base the RFC on a claimant's "subjective complaints, the objective medical evidence, and the opinions of treating, examining, and nonexamining physicians." <u>Felton-Miller</u>, 459 Fed. App'x at 231.

This Court finds the ALJ reviewed the entire record, both medical and non-medical evidence, as he is required to do. <u>See</u> 20 C.F.R. § 404.1520(e). The ALJ handed down a detailed, twenty-page decision outlining his reasons for finding Claimant retained the ability to perform light work (with detailed limitations), despite his finding Claimant has severe impairments of arthritis, degenerative disc disease, fibromyalgia, asthma, obesity and depression. The ALJ considered the opinions of the two reviewing state agency experts, the correlating medical evidence, Claimant's reported daily activities and the administrative record as a whole. As discussed in the previous section, this twenty-page decision does provide and extensive and detailed description and discussion of the evidence the ALJ did review and consider. This discussion provides substantial evidence to support the ALJ's RFC determination that Claimant is capable of a limited range of light work.

**3.      Substantial Evidence Supports the ALJ's Step Five Determination That Plaintiff Is Capable of Work**

Finally, Claimant contends the ALJ erred in deciding there are jobs that exist in significant numbers that Claimant could perform.  See Pl.'s Mem., Pg. 8.  Claimant argues he could not work as two of the discussed positions in his brief.  First, Claimant argues he could not work as a sorter because that job would require that he walk, sit or stand more than two hours at a time, he would have to push and pull, he would have to lift the items to be sorted, he would have more than occasional interaction with co-workers and/or the public, and he would have to reach and bend.  Id. at 8-9.  Similarly, Claimant argues the position of parking lot attendant would require sitting or standing for long periods of time and more than occasional interaction with the public.  Id. at 9.

If a claimant has met her burden of showing that she is not able to perform her past relevant work, the Commissioner then has the burden of showing that the claimant is able to perform work existing in significant numbers in the national economy.  See McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).  During the fifth step of the sequential analysis, the ALJ must pose hypotheticals to the Vocational Expert ("VE") that "fairly set out all of [the] claimant's impairments."  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (alteration in original); see also Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (hypotheticals must "adequately" describe the claimant's impairments).  However, the ALJ need only include those limitations supported by the record in the hypotheticals.  Johnson, 434 F.3d at 659.  Furthermore, an ALJ is not required to "submit to the [VE] every impairment alleged by a claimant."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005) (alteration in original).

Claimant's argument must fail.  At the hearing, the VE confirmed that he reviewed the file and was present for Claimant's hearing testimony.  (Tr. 146.)  The ALJ then gave the VE a

"series of hypotheticals". (Tr. 148). In one hypothetical, the ALJ included a profile of an individual derived from the RFC Assessment completed by Dr. Amy Wirts. (Tr. 148, 430). In response, the VE determined Claimant could not perform his previous work of construction but could perform such jobs his previous work as fast food work. (Tr. 148). When the ALJ was inquiring into what jobs, other than previous work, Claimant could perform that exist in the national or regional economy, the ALJ stated, "Okay, give me two". (Tr. 148). The ALJ then added onto that RFC-derived profile additional limitations – making it unskilled, routine, repetitive and involving only occasional interaction with the public and co workers. (Tr. 148). The VE testified Claimant could not then perform any previous work but could perform other jobs. The VE testified that such hypothetical person could perform jobs that exist in significant numbers in the national and regional economy, such as cashier, sorter, and parking lot attendant. (Tr. 151). This was not the limit of jobs that Claimant could perform. Claimant argues Dr. Duffy and Dr. Rezaian's statements he is not able to stand, walk or sit for more than two hours, cannot push or pull, cannot lift ten pounds frequently and cannot lift twenty pounds preclude light work. See Pl.'s Summ. J. Mot., Pg. 8. However, an ALJ is not required to accept the answers a VE gives to a hypothetical that contains limitations not ultimately adopted by the ALJ, and stated above, the substantial evidence supports the ALJ's decision to give these two physicians' opinions little weight. See Hammond v. Apfel, 5 F. App'x 101, 105, 2001 WL 87460, at *4 (4th Cir. Feb. 1, 2001) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1986)). This Court finds the ALJ posed the hypothetical question according to functional limitations credibly established in Claimant's medical evidence of record. This Court further finds the ALJ satisfied his burden of showing that significant numbers of jobs exist in the

national economy that Claimant could perform. Accordingly, because substantial evidence supports the ALJ's findings concerning the medical evidence and RFC assessments, he only needed to include the limitations supported by the record in his hypotheticals. See Johnson, 434 F.3d at 659. Therefore, substantial evidence supports the ALJ's Step Five determination that Claimant is capable of work existing in substantial numbers in the national economy.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 14) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 17) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and

Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 16th Day of May, 2013.


_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE